**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **PULSELINK SYSTEMS, LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ZOOM COMMUNICATIONS, INC.,**<br><br>**Defendant.** | **Civil Action No. _______________**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff PulseLink Systems, LLC ("PulseLink" or "Plaintiff") brings this action for patent infringement against Defendant Zoom Communications, Inc. ("Zoom" or "Defendant") and alleges as follows:

## NATURE OF THE ACTION

1. This is a civil action for patent infringement arising under the United States Patent Act, 35 U.S.C. § 101 et seq., including 35 U.S.C. § 271. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

2. Zoom has infringed and continues to infringe at least one claim of U.S. Patent Nos. 11,108,911 (the "'911 patent"), 8,369,324 (the "'324 patent"), and 9,544,340 (the "'340 patent") (collectively, the "Asserted Patents").

3. Zoom infringes directly, literally, and/or under the doctrine of equivalents, contributes to the infringement of, and/or induces infringement of the Asserted Patents by making, using, selling, offering for sale, and/or importing into the United States Zoom's cloud-based communications platform, systems, software, and services, including Zoom Contact

Center and Flow Designer, the Zoom Workplace Desktop App and its Media Engine, and Zoom Meetings and Conference Room Connector (collectively, the "Accused Products").

## THE PARTIES

4. PulseLink is a Texas limited liability company with a principal place of business in Allen, Texas.

5. PulseLink owns by assignment the entire right, title, and interest in and to the Asserted Patents, including the right to sue and recover damages for past, present, and future infringement. The Asserted Patents claim foundational technologies for intelligent routing of contact-center communications using dynamic routing attributes and skills-based frameworks, interoperable cloud conferencing between browser-based web sessions and SIP/H.323 room systems through protocol-agnostic interfaces and APIs, and adaptive real-time media transmission that groups, compresses, buffers, and adjusts video data based on network conditions, as described in the Overview of the Patented Technology below.

6. Zoom Communications, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal executive offices at 55 Almaden Boulevard, 6th Floor, San Jose, California 95113. Zoom was formerly known as Zoom Video Communications, Inc.

7. Zoom develops and provides cloud-based communication and collaboration products and services, including Zoom Workplace, Zoom Meetings, Zoom Phone, Zoom Contact Center, Zoom Rooms, and related client applications, cloud services, administrator tools, signaling systems, media-processing systems, and support services.

8. Zoom operates and controls the zoom.com, zoom.us, support.zoom.com, and related websites through which it markets, sells, distributes, documents, updates, and supports the Accused Products throughout the United States, including within Delaware.

9. Zoom has placed and continues to place the Accused Products into the stream of commerce through established distribution channels, subscription agreements, reseller relationships, downloadable software, cloud-hosted services, and technical-support programs, with knowledge and intent that they will be purchased and used throughout the United States.

## JURISDICTION AND VENUE

10. This action arises under the patent laws of the United States, including 35 U.S.C. §§ 271, 281, 284, and 285.

11. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

12. This Court has personal jurisdiction over Zoom because Zoom is incorporated under the laws of the State of Delaware and is therefore at home in Delaware. Zoom also purposefully conducts substantial business in Delaware and throughout the United States through the accused cloud platform, services, software, subscriptions, and related support activities. Zoom has furthermore engaged in continuous, systematic, and substantial business in Delaware, and Zoom has committed and continues to commit acts of patent infringement in Delaware.

13. Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b) because Zoom is a Delaware corporation and therefore resides in this District for purposes of patent venue. Zoom has furthermore committed and continues to commit, acts of patent infringement in Delaware and in this District.

14. Zoom has committed and continues to commit acts of infringement in the United States, including by operating and providing the Accused Products to customers in Delaware,

contracting with customers and partners in Delaware, and causing accused software and cloud functionality to be used in Delaware.

15. PulseLink has been injured by Zoom's acts of infringement, and that injury is continuing.

## THE ASSERTED PATENTS

16. On August 31, 2021, United States Patent No. 11,108,911, entitled "System and method for flexible routing", issued. The '911 patent names Harsh V. Mendiratta and Tibor Lukac as inventors. PulseLink owns by assignment the entire right, title, and interest in and to the '911 patent, including all rights to sue and recover damages for past and future infringement. A true and correct copy of the '911 patent is attached as **Exhibit A**.

17. On February 5, 2013, United States Patent No. 8,369,324, entitled "Variable compression queue", issued. The '324 patent names Alan R. Breight, Jeffrey Chu, Marc A. Geist, and Robert C. Steiner as inventors. PulseLink owns by assignment the entire right, title, and interest in and to the '324 patent, including all rights to sue and recover damages for past and future infringement. A true and correct copy of the '324 patent is attached as **Exhibit B**.

18. On January 10, 2017, United States Patent No. 9,544,340, entitled "Application programming interface enabling communication features for different communication protocols" issued. The '340 patent names Joel M. Ezell as the inventor. PulseLink owns by assignment the entire right, title, and interest in and to the '340 patent, including all rights to sue and recover damages for past and future infringement. A true and correct copy of the '340 patent is attached as **Exhibit C**.

19. PulseLink is the true and correct owner of the Asserted Patents and holds all rights necessary to bring this action, including the right to recover for past, present, and future infringement.

## FACTUAL BACKGROUND

20. PulseLink is the owner by assignment of the entire right, title, and interest in and to the Asserted Patents, including all rights to recover for past and future infringement. The Asserted Patents claim foundational technologies in intelligent routing of contact-center communications using dynamic routing attributes and skills-based frameworks, interoperable cloud conferencing between browser-based web sessions and SIP/H.323 room systems through protocol-agnostic interfaces and APIs, and adaptive real-time media transmission that groups, compresses, buffers, and adjusts video data based on network conditions.

21. Zoom is a leading provider of cloud-based communications and collaboration products and services. Zoom designs, develops, makes, uses, markets, sells, offers for sale, provides, and supports the Accused Products throughout the United States, including in Delaware. The Accused Products and their associated software and services practice the inventions claimed in the Asserted Patents, as described below and in the exemplary claim charts attached as **Exhibits D through F**, which are incorporated herein by reference.

22. By building its platform, products, features, software, and related services on PulseLink's patented technologies, Zoom infringes, and induces and contributes to the infringement of, the Asserted Patents by making, using, selling, offering for sale, and/or importing into the United States the Accused Products (defined below), including through its distributors, customers, subsidiaries, importers, consumers, customers, and/or users. This has caused, and continues to cause, substantial and irreparable harm to PulseLink.

23. PulseLink previously filed *PulseLink Systems, LLC v. Zoom Communications, Inc.*, Civil Action No. 2:26-cv-00343, in the United States District Court for the Eastern District of Texas on April 27, 2026. That action concerns different patents and different claimed inventions. Although certain product names may overlap, the technical mechanisms, infringement proof, discovery, and damages issues presented here are distinct.

## OVERVIEW OF THE PATENTED TECHNOLOGY

### The ’911 Patent — Flexible, Attribute-Driven Routing

24. The ’911 patent is directed to a concrete, rules-based routing framework implemented in contact-center and unified-communications network systems. It addresses a technical problem in conventional systems that relied on static or preconfigured paths and could not use information carried with an incoming communication request to select a destination dynamically. The disclosed framework receives a session-establishment request, uses request-borne routing data in a defined lookup and rules process, and routes the resulting session to a selected destination, thereby decoupling destination selection from a fixed call path and permitting the network to adapt the route to the particular session without rewriting the underlying call-flow logic.

25. The ’911 patent discloses receiving a request to establish a first communication session with a second communication device, where the request comprises a first routing attribute; looking up that attribute in a dynamic routing framework; identifying a third communication device or destination based on the lookup and one or more rules defined in the framework; and routing the first communication session to that identified third device or destination. The destination is thus selected from request-borne information and a rules-based framework, rather than being a fixed endpoint or an undifferentiated instruction to route a call.

For example, the framework can identify a particular contact-center queue or other destination directly instead of initially routing the session to a generic IVR system.

26. Dependent claims 13 and 14 further narrow this operation by requiring multiple routing attributes and logical operators applied to those attributes. The attributes are tied to communications routing and may include language, agent skill, agent skill level, contact-center queue information, a destination identifier, and information carried in SIP, SDP, H.323, WebRTC, or proprietary headers. Applying conjunctive, alternative, or fallback rules to those attributes permits the network to select an eligible agent, queue, or other destination from a particular combination of session and agent conditions.

27. Claims 15 and 16 further narrow the claimed routing sequence by requiring selection of a routing attribute through a user interface on a first communication device and insertion of that selected attribute into the session-establishment request by a network routing application. These limitations specify how routing information enters the communications system and how user-driven or application-mediated information becomes part of the network routing decision; they do not merely state a desired result or a general instruction to consider user preferences.

28. The combination of request-borne attributes, a dynamic framework, rules-based lookup, identification of a third device or destination, and subsequent session routing provides a concrete routing pipeline that departs from static call trees and fixed endpoint selection. The written description provides implementations of routing rules, attribute formats, user interfaces, contact-center queues, communication devices, network routing applications, and administration systems, including the operations by which the framework evaluates attributes and selects a destination. These details describe how the technology changes the operation of a

communications network to route sessions using current session information and defined routing logic.

29. Accordingly, a person of ordinary skill in the art reviewing the ’911 patent’s specification and claimed inventions would understand that the claimed inventions reflect substantial, non-conventional, and valuable contributions in the technology area of dynamic attribute-driven routing for contact-center and unified-communications systems. A person of ordinary skill in the art would further understand that the inventive claims describe a non-conventional and non-generic arrangement of known, conventional pieces—including request-borne routing attributes, a dynamic rules framework, attribute lookup, destination identification, and session routing—that operates as an integrated routing pipeline rather than a collection of generic communications components.

30. Zoom Contact Center provides an omnichannel contact-center platform supporting communications between consumers and agents over voice, video, email, messaging, and web channels through the Zoom Data Center. Zoom also implements Skills-Based Routing to direct incoming engagements to qualified agents based on language, product certification, technical specialization, or combinations of skills.

31. For example, Zoom describes routing a French-speaking customer seeking assistance with a Windows client to an agent who has corresponding French-language and Windows-support skills. The consumer’s stated needs therefore supply routing information that the system uses to identify an appropriate agent or destination.

32. Zoom’s Collect Input widget collects consumer input, including a language preference, and can map an exit to a skill. The Condition widget can map variable contents to a skill requirement, the Set Skill widget can set a skill on the engagement, and the Route To

widget can use a variable to route the engagement to a queue, agent, another Flow, or an external number.

33. Zoom also provides a Data Table widget that looks up information from preconfigured data tables using a static or variable-based key, maps selected columns to Flow variables, and provides success, failure, and no-match exits. The Flow, its skill mappings, Data Tables, variables, Agent Routing Profiles, and Route To widget together form a configurable, administrator-defined dynamic routing framework that replaces hardcoded logic with data-driven routing.

34. Zoom's Agent Routing Profiles specify relevant skill categories, priorities, required or optional status, proficiency thresholds, time-step relaxation, fallback skills, and agent eligibility. Zoom further provides Contact Center SDKs for Web, iOS, and Android, together with consumer-facing IVR, text-entry, quick-reply, and dropdown interfaces that capture a selected language or other routing attribute and transmit it with the incoming engagement.

35. An exemplary claim chart showing how Zoom Contact Center practices representative claims of the '911 patent is attached as **Exhibit D.**

**The '324 Patent — Variable Compression Queue**

36. The '324 patent is directed to a concrete real-time media-transmission pipeline that controls how uncompressed data is organized, compressed, queued, and released over a connection whose condition can change during an active transmission. It addresses technical problems in moving media data through a finite transmission queue: fixed-size blocks and fixed compression settings can cause queue growth, excess memory or bandwidth use, delayed delivery, and avoidable loss of real-time media when bandwidth, packet loss, latency, jitter, congestion, or device resources change.

37. Rather than merely calling for compression or transmission, the patent coordinates block construction, compression, queue placement, connection-status evaluation, and adaptive reconfiguration. When conditions are unacceptable, the claimed feedback operation changes either the membership of a block—the number of uncompressed data elements grouped for processing—or the degree of compression before further queued data is released. This gives the media pipeline a technical mechanism for keeping block formation and compression responsive to live connection conditions instead of relying on a fixed encoder configuration.

38. The ’324 patent discloses: receiving uncompressed data elements for transmission to a destination node; grouping first and second pluralities of those elements into first and second blocks; setting at least one block size using a predetermined characteristic, with the first and second block sizes different; compressing the blocks into corresponding compressed blocks; placing a compressed block in a transmission queue; determining connection status; transmitting the queued block when the status is acceptable; and, when the status is unacceptable, changing the number of data elements in the block or increasing its degree of compression. The inventive solution operates on the data before and within the transmission queue and links the connection-status determination to a specified change in data organization or compression.

39. Claim 4 further specifies that the predetermined characteristic is the number of data elements in the block. That limitation supplies a particular technical control variable for constructing the source block before compression: changing the number of elements changes which data enters the compressor, the amount of data represented by the block, and the work and queue occupancy associated with its transmission. It therefore adds a concrete narrowing condition beyond generic compression or an instruction to adapt a media stream. The written description provides concrete architectures, queues, processing modules, quality-of-service

metrics, thresholds, compression parameters, and resource conditions for implementing the claimed variable-compression behavior.

40. Accordingly, a person of ordinary skill in the art reviewing the ’324 specification and claimed inventions would understand that the claimed inventions reflect substantial, non-conventional, and valuable contributions in the technology area of adaptive variable-compression queueing for real-time media transmission. A person of ordinary skill in the art would further understand that the inventive claims describe a non-conventional and non-generic arrangement of known, conventional pieces—including uncompressed data elements grouped into blocks of selected size, compression, queue placement, connection-status evaluation, and feedback-driven changes to block membership or compression—that operates as an integrated media-transmission pipeline responsive to live network and device conditions.

41. The Zoom Workplace Desktop App running on a supported computer captures local video and initiates outbound transmission to remote meeting participants through Zoom’s media path. Zoom identifies H.264 AVC as a streaming codec and describes video processing between capture and transmission.

42. On information and belief, the Media Engine receives successive uncompressed picture samples and groups each capture interval into a discrete source-frame block before compression. The first and second blocks therefore contain separate pluralities of uncompressed samples, rather than one undifferentiated body of data.

43. Zoom publicly identifies resolution as a selectable characteristic and describes spatial adjustment by resolution. Resolution sets the number of sample locations in a source-frame block before compression; for example, a 360p frame has approximately 230,400 picture locations, while a 720p frame has approximately 921,600, producing blocks of different sizes.

44. The Media Engine compresses each source-frame block using H.264/AVC and produces a corresponding coded picture, access unit, or stream segment. It then retains the compressed output in an ordered encoded-output or transmit buffer, or equivalent scheduling queue, before releasing it into the outbound media stream.

45. Zoom's quality materials describe monitoring through network-quality statistics, callbacks, and diagnostics, including codec, frame-rate, and network information, while its Reactive QoS Layer adapts to network and device conditions. When the connection status is acceptable for a selected stream, the Media Engine sends the queued compressed block; Zoom identifies estimated bandwidth examples such as approximately 1.2 Mbps for 720p and 3.8 Mbps for 1080p in a one-to-one meeting.

46. When the connection status is unacceptable, Zoom's Adaptive Codec and Reactive QoS Layer adjust streams temporally and spatially. Lowering the selected resolution changes the number of uncompressed data elements in the source-frame block before re-encoding; Zoom also documents frame-rate reduction and bitrate or compression adaptation as additional responses to degraded conditions.

47. An exemplary claim chart showing how Zoom Workplace Desktop App practice representative claims of the '324 patent is attached as **Exhibit E**.

**The '340 Patent — Protocol-Agnostic Collaboration Interfaces**

48. The '340 patent is directed to a concrete collaboration architecture that bridges a browser-based web session with native applications and conference-room systems using different communications protocols, including SIP and H.323. It addresses the technical interoperability problem of allowing those systems to participate in and control a common collaboration session without requiring the native applications to operate through, or expose themselves to, the

browser's web-based protocol. The architecture preserves the native communications path while providing a controlled interface through which the browser-facing environment can invoke native functions.

49. The '340 patent discloses a collaboration environment that provides a protocol-agnostic communications interface between a browser and one or more applications, together with a protocol-agnostic call/media API and a feature invoker. The interface is a communications and control boundary—not merely an instruction to use multiple protocols—and coordinates meeting, signaling, call-control, calendar, registration, device-management, and media functions across web and non-web paths. By presenting common invocation functions while maintaining the underlying protocol-specific paths, the architecture permits heterogeneous endpoints to operate in one session without requiring each native application to implement the browser's protocol.

50. Claim 1 recites operating the collaboration environment in either a native mode, in which applications are contained within the environment, or a traditional mode, in which at least some applications are external and operate natively through a protocol other than the web-based communications protocol. The alternative modes are disjunctive, so either branch independently satisfies the limitation. In either branch, the claimed architecture still requires the environment, the protocol-agnostic interface, the browser session, and the feature-invoker/API relationship that coordinates the different communications paths.

51. The claimed environment conducts a communication session with a browser using a web-based communications protocol while coordinating communications with native applications using their own protocols. Zoom's Web App permits a user to join a meeting through a browser, and Zoom's browser-side implementation uses WebRTC and related web

standards, while the same meeting can include standards-based SIP/H.323 room systems through Conference Room Connector. This is a specific cross-protocol session arrangement in which browser media and signaling are coordinated with native room-system media and signaling rather than treated as a single web-only connection.

52. The claim further recites accessing the applications during the communication session through a feature invoker using a protocol-agnostic call/media API. The API and feature-invoker arrangement provides a common control surface for functions such as SIP/H.323 registration and signaling, meeting join and call-out, calendar integration, mute and unmute, device settings, management, status, and feedback. Those functions are coordinated through the interface and dispatched over the appropriate native or web path, allowing the browser-facing collaboration environment to control or invoke native applications without requiring the applications to speak the browser's protocol.

53. The claimed feature invoker operates without exposing the applications to the browser's web-based communications protocol. That separation has a concrete implementation: the browser/WebRTC/HTTPS path remains distinct from the SIP and H.323 signaling and connector paths, while the protocol-agnostic API mediates the requested call and media functions at the boundary. Native applications therefore remain on their native protocol stacks, yet browser controls can invoke their meeting, signaling, media, and device-management operations within the common session.

54. Taken together, the independent-claim limitations specify a particular protocol-agnostic collaboration architecture: a collaboration environment, a browser session, native or external applications, a feature invoker, and a call/media API that coordinates distinct protocol paths while keeping the native applications insulated from the browser protocol. The written

description provides concrete collaboration-environment, browser, application, API, connector, signaling, and communications-path implementations sufficient to show how the architecture operates across heterogeneous systems. The claimed arrangement improves interoperability by allowing browser participants and native SIP/H.323 applications to share and control a session without collapsing the native applications into the browser's protocol.

55. Accordingly, a person of ordinary skill in the art reviewing the '340 patent's specification and claimed inventions would understand that the claimed inventions reflect substantial, non-conventional, and valuable contributions in the technology area of protocol-agnostic collaboration interfaces for browser sessions and SIP/H.323/native applications. A person of ordinary skill in the art would further understand that the inventive claims describe a non-conventional and non-generic arrangement of known, conventional pieces—including a browser session, native applications, a feature invoker, a protocol-agnostic call/media API, and distinct WebRTC/HTTPS and SIP/H.323 communications paths—that allows browser controls to invoke native meeting, signaling, media, and device-management functions without exposing the native applications to the browser's web-based communications protocol.

56. Zoom's Conference Room Connector materials describe a cloud gateway and signal flow through which standards-based SIP/H.323 room systems connect to Zoom Meetings. Related materials describe web controls, dialing procedures, additional room-connector features, and managed-device functions used during the common meeting session.

57. Zoom further documents interoperability guides, CRC APIs, calendar integration, one-touch meeting join, SIP proxy registration, device control, mute synchronization, management, and feedback. These functions illustrate the practical value of a cross-protocol interface that lets browser participants and native room applications participate in and control the

same collaboration session. Together, the foregoing features reflect the concrete, protocol-agnostic collaboration architecture claimed in the ’340 patent.

58. An exemplary claim chart showing how Zoom Cloud and Conference Room Connector practice at least claim 1 of the ’340 patent is attached as **Exhibit F**.

## ZOOM’S INFRINGING PRODUCTS AND ACTIVITIES

59. Zoom makes, uses, imports, offers for sale, sells, provides, and supports the Accused Products throughout the United States, including in Delaware. The Accused Products include current, predecessor, and successor versions containing materially similar functionality, and exemplary products specific to each Asserted Patent are identified below and in the exemplary claim charts attached as Exhibits D through F.

### Zoom Contact Center and Flow Designer

60. The ’911 Accused Products include, for example, the Zoom platform and its Zoom Contact Center, Flow Designer, the Zoom Data Center infrastructure, Contact Center SDKs, and related software, services, and administrator tools that receive and route omnichannel consumer engagements.

61. Zoom Contact Center receives incoming consumer engagements through a Flow entry point. For voice engagements, the customer SBC sends an INVITE containing an SDP offer, and the Request-URI contains destination-party information, including an E.164 user portion for BYOC-P calls. The incoming request or engagement also conveys consumer information used to route the session.

62. The Collect Input widget can prompt a consumer for the language in which the consumer would like to be served, including through an IVR keypad, video text box, web-chat

quick replies, or dropdown responses. Zoom maps the input to skills or variables, and the Flow carries the resulting routing attribute into subsequent routing operations.

63. The Flow evaluates the routing attribute through Collect Input, Condition, Set Skill, Script, and Route To widgets. Zoom also provides a Data Table widget that uses a static or variable-based key to look up call-routing information, maps selected columns to Flow variables, and provides conditional success, failure, and no-match paths.

64. Zoom's Agent Routing Profiles define the skill categories, priorities, required or optional status, proficiency thresholds, time-step relaxation, and fallback rules used to determine agent eligibility. The Route To widget can then use a variable resolving to a specific eligible agent, queue, Flow, or external number, rather than a fixed destination.

65. Zoom's official variable-routing example identifies Start.To as the callee or called number, applies JavaScript or other configured rules to that value, selects a queue or agent destination, and directs Route To to use the resulting variable. The called-number attribute is therefore a destination identifier and, for voice engagements, corresponds to information carried in a SIP header.

66. The Contact Center SDKs for Web, iOS, and Android allow a consumer to initiate an engagement through a website or mobile application. The selected language or other routing attribute is included in the incoming engagement information, mapped to a skill, and used by the Flow and Agent Routing Profile to identify an appropriate destination.

**<u>Zoom Workplace Desktop App Media Engine</u>**

67. The '324 Accused Products include, for example, the Zoom platform and the Zoom Workplace Desktop App for supported Windows computers and related Zoom

applications and services that capture, encode, buffer, schedule, and transmit real-time video to remote meeting participants through Zoom's media path.

68. On information and belief, the Media Engine receives uncompressed pixel or picture samples from a locally captured video stream before H.264/AVC encoding. Each capture interval produces a source-frame block containing a defined set of samples, and the app repeatedly forms and processes such blocks for outbound transmission.

69. Successive capture intervals produce first and second frame blocks containing separate pluralities of uncompressed samples. Zoom's documented frame-rate examples and continuing video streams support temporally distinct blocks rather than one undifferentiated body of data.

70. Zoom identifies resolution as a selectable characteristic and describes spatial adaptation by resolution. On information and belief, a resolution change causes a subsequent source-frame block to contain a different number of uncompressed picture samples; a 720p frame has approximately 921,600 picture locations, compared with approximately 230,400 for 360p.

71. The Media Engine applies H.264/AVC compression to each resolution-defined source-frame block, producing a corresponding coded picture, access unit, or stream segment. Zoom describes multiple simultaneous H.264 AVC streams and adaptive layers selected according to far-end resolution, layout, and current conditions.

72. On information and belief, the Media Engine retains each encoded frame in an ordered coded-output or transmit buffer, or equivalent scheduling queue, before releasing it to the outbound H.264 stream. Zoom monitors network-quality statistics, callbacks, and

diagnostics, including codec, frame-rate, and network information, and sends the selected compressed stream when the connection status is acceptable.

73. When the connection status is unacceptable, Zoom's Reactive QoS Layer and Adaptive Codec can lower resolution, reduce frame rate, reduce bitrate, or otherwise adapt the stream. On information and belief, lowering resolution changes the number of samples in the source-frame block before re-encoding, satisfying the claimed change to block membership; these products also practice claim 4 when the number of data elements is the predetermined characteristic.

**Zoom Cloud and Conference Room Connector**

74. The '340 Accused Products include, for example, the Zoom platform and its Zoom Cloud, Zoom Meetings, the Zoom Web App, Conference Room Connector, CRC Interop Service, Enhanced API Connector, CRC APIs, and related meeting-room and interoperability services. These products allow browser participants and standards-based SIP/H.323 room systems to participate in the same Zoom Meeting.

75. Zoom Cloud provides a protocol-agnostic communications interface between the browser-facing Zoom service and applications or devices using SIP, H.323, connector APIs, registration, calendar, call-control, device-management, and media functions. The documented web, SIP, and H.323 paths support an interface operating across communications protocols.

76. The Zoom Cloud and CRC products operate in the claimed traditional mode because at least some managed room-system applications remain external to Zoom Cloud and operate natively through SIP or H.323 rather than through the browser's web-based protocol. In the alternative, Zoom-hosted Meetings and collaboration functions operate in the claimed native mode.

77. The Zoom Web App permits a user to join a meeting through a browser without a separate plugin, and Zoom's browser-side meeting session uses WebRTC and related web standards. That browser session is coordinated with SIP/H.323 room-system participation through Zoom Cloud and CRC.

78. During the communication session, the CRC, CRC Interop Service, Enhanced API Connector, or related browser-side control layer acts as a feature invoker. It accesses or invokes SIP/H.323 registration and signaling, meeting join and call-out, calendar integration, mute and unmute, device settings, management, status, and feedback through a protocol-agnostic call/media API.

79. The feature-invoker and API paths permit browser controls to invoke the native room-system functions without exposing those applications to the browser's web-based communications protocol. Zoom documents separate browser/WebRTC/HTTPS, SIP, H.323, and connector paths, supporting the claimed cross-protocol separation.

## ZOOM'S KNOWLEDGE, INDUCEMENT, AND WILLFUL INFRINGEMENT

80. On March 27, 2026, PulseLink sent Zoom's Chief Legal Officer a formal notice and opportunity to discuss the Avaya patent portfolio, including the Asserted Patents. The communication highlighted the alignment between PulseLink's patents and Zoom's core products, including Zoom Meetings, Zoom Phone, and Zoom Workplace, and invited constructive business dialogue.

81. After Zoom did not provide a substantive business response, PulseLink filed a Complaint in the United States District Court for the Eastern District of Texas on April 27, 2026.

82. Throughout April and early May 2026, PulseLink continued efforts to engage Zoom's legal contacts toward a business-oriented resolution and warned that failure to engage

would lead to further escalation. By late June 2026, PulseLink established direct communication with Zoom's in-house legal team, and on June 29, 2026, representatives for PulseLink and Zoom met to discuss potential resolution paths.

83. The March 27 notice and subsequent pre-suit outreach put Zoom on notice of the relevant patent portfolio, the Asserted Patents, the relationship between the patented technologies and Zoom's products, and the potential infringement allegations before the filing of the Texas action. At the latest, Zoom had actual knowledge of the Asserted Patents and PulseLink's infringement allegations upon filing and service of this Complaint.

84. Upon information and belief, Zoom is a sophisticated communications-technology company that monitors patents and technologies relevant to cloud communications, contact centers, media processing, interoperability, and collaboration systems. In light of the formal notice, repeated outreach, and opportunities to discuss the patent portfolio and the potential infringement allegations, Zoom knew of the relevant patent issues before the Texas action was filed and before this action was filed. Alternatively, to the extent Zoom disputes that it had actual knowledge before filing, Zoom was willfully blind to a high probability that its Accused Products practiced patented technologies reflected in the Asserted Patents.

85. Despite having notice of the relevant patent portfolio and the infringement allegations, and despite multiple opportunities to discuss and address them, Zoom continues to make, use, offer for sale, sell, import, provide, update, support, and instruct customers and end users to use the Accused Products in the accused manner.

86. Zoom also directs and controls customer's use of the Accused Products and benefits from it. For example, Zoom controls customer's access and use of the Accused

Products. *See, e.g.*, https://www.zoom.com/en/trust/terms/. Zoom also specifies the manner in which infringement occurs.

87. Zoom publishes technical documentation, administrator instructions, developer materials, configuration examples, release notes, and support articles that direct and encourage customers and end users to configure and operate the Accused Products in the accused manner. Those materials include Contact Center Flow, Collect Input, Data Table, Agent Routing Profile, Route To, and SDK documentation; Quality of Service, codec, reliability, and video-statistics materials describing adaptive media processing; and Conference Room Connector, Web App, interoperability, dialing, API, registration, calendar, call-control, and device-management materials describing cross-protocol meeting functionality.

88. Zoom has had and continues to have specific intent that customers and end users employ the accused functionality because the accused modes of operation are standard, advertised, supported, and commercially important features of Zoom's products and services. A reasonable inference from Zoom's conduct is that Zoom specifically intends for customers and end users to use the Accused Products in a manner that directly infringes the Asserted Patents.

89. Induced infringement under 35 U.S.C. § 271(b) requires knowledge of the asserted patent and knowledge that the induced acts constitute infringement, a standard that may be satisfied by willful blindness, together with specific intent to bring about the infringing acts. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766, 769 (2011); *Commil USA, LLC v. Cisco Systems, Inc.*, 575 U.S. 632, 639-42 (2015). Zoom's continued design, distribution, marketing, and technical support of the accused functionality after receiving notice of the relevant patent portfolio and the potential infringement issues, and after being afforded multiple opportunities to discuss and address them, satisfies that standard.

90. Zoom does not merely make the accused functionality available; it affirmatively trains and instructs customers and end users through administrator guides, developer documentation, SDK materials, support articles, and technical forums to configure and operate that functionality. Zoom's Contact Center materials direct customers to build Flows and route engagements using skills and variables; its media materials describe the adaptive codec, Reactive QoS Layer, and stream selection; and its CRC materials instruct customers and integrators to register, join, control, and manage native SIP/H.323 room systems from Zoom meetings.

91. The accused functionality is not peripheral or experimental; it is integrated into Zoom's commercially offered contact center, meeting, media, and conference-room products. On information and belief, Zoom derives substantial revenue from making, using, selling, offering for sale, providing, and supporting the Accused Products in the United States.

92. Zoom's continued infringement after receiving notice of the relevant patent portfolio and after multiple opportunities to discuss and address the potential infringement allegations, has been deliberate and wanton and thus supports enhanced damages to the extent proven under 35 U.S.C. § 284, as well as an exceptional-case finding under 35 U.S.C. § 285.

**COUNT I - INFRINGEMENT OF THE '911 PATENT**

93. PulseLink re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

94. PulseLink has not licensed or otherwise authorized Zoom to practice the inventions claimed in the '911 patent.

95. Zoom has infringed and continues to directly and indirectly infringe at least claims 11, 13, 14, 15, and 16 of the '911 patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(a), (b), and (c), including by making, using, selling, offering for

sale, and/or providing in the United States the ’911 Accused Products. The ’911 Accused Products include Zoom Contact Center, Flow Designer, the Zoom Data Center infrastructure, Contact Center SDKs, and related software and services. As shown in the exemplary claim chart attached as Exhibit D, these products infringe the asserted claims.

96. For example, claim 11 recites a method comprising receiving a request to establish a first communication session with a second communication device, where the request comprises a first routing attribute; looking up the first routing attribute in a dynamic routing framework; identifying a third communication device or destination based on the lookup and rules defined in the framework; and routing the first communication session to that identified third device or destination. The claim thus requires a request-borne input, a rules-based lookup, a destination-identification operation, and routing to the resulting third destination, including a queue or other selected destination rather than an obligatory initial IVR path.

97. The ’911 Accused Products meet each limitation of at least claim 11, as set forth in detail in Exhibit D and summarized below. Zoom’s omnichannel Contact Center receives consumer engagements through the Zoom Data Center and an associated Flow entry point, corresponding to the requested session with the second communication device.

98. As to the routing-attribute limitation, the incoming engagement conveys information about the consumer’s requested assistance, such as a language, product capability, or technical skill, in the request or associated session-establishment information. Collect Input, Condition, and Set Skill map that information to an engagement skill or routing variable, and the Flow carries the resulting attribute into the routing operation. The accused sequence therefore uses information supplied with the particular engagement, not merely a fixed destination configured independently of the request.

Zoom Contact Center is an omnichannel contact center that's optimized for video and integrated into the same Zoom experience. Zoom Contact Center brings unified communications together with contact center capabilities.

For example, let's say your organization is a software firm that supports customers in the US and Canada who use MacBooks and Windows laptops. If a French-speaking customer calls in asking for troubleshooting the Windows client, Zoom Contact Center can route them to a tech support agent that speaks French and is proficient with handling issues for Windows.




99. As to the lookup limitation, Zoom's Flow is an administrator-configured, rules-based dynamic routing framework. Its Data Table widget uses a static or variable-based key to look up call-routing information, maps selected table columns to Flow variables, and supplies conditional success, failure, and no-match paths. The framework thereby performs a defined lookup and rules evaluation on the routing attribute before the session is sent to the selected destination, replacing a hardcoded path with data-driven routing logic.

> **Flows**
>
> A Flow is where the system identifies what the consumer needs before they enter a queue. Through IVR menus, variable logic, and other widgets, the Flow assigns the required skills to the engagement.
>
> Skills are typically identified using either a combination of **Collect Input** and **Condition** or the **Set Skill** widgets:
>
> - Collect Input widgets map a skill requirement to consumer input (for example, digit selection in an IVR menu).
> - Condition widgets map a skill requirement to the contents of a variable
> - Set Skill widget directly sets a skill
>
> Once skill requirements have been identified, a Route To widget sends the engagement into a queue.

100. As to the destination-identification and routing limitations, Zoom's Agent Routing Profiles evaluate skill categories, priorities, required or optional status, proficiency thresholds, time steps, and fallback skills. Zoom identifies an eligible agent or other third destination, and Route To dynamically routes the engagement to that identified agent, queue, Flow, or external number rather than to a predetermined endpoint. The accused operation therefore performs both the claimed identification and the subsequent routing based on the request attribute and framework rules.

101. Claims 13 and 14 are also infringed. For example, Zoom can combine multiple routing attributes, such as French-language service and Windows support or French and Billing, using conjunctive, alternative, or fallback logic. The routing attributes include language, agent skill, and agent skill level, and the Agent Routing Profile applies those attributes and logical conditions to identify an eligible agent or other destination. These limitations further tie the routing decision to a specified combination of technical session and agent data.

102. Claims 15 and 16 are also infringed. For example, a consumer-facing IVR, video, web-chat, website, or mobile-application interface allows the consumer to select a routing

attribute, and a Contact Center SDK, Flow engine, or other network routing application inserts or carries that selected attribute into the engagement request or session-routing context. The Flow then maps the attribute to a skill or variable, evaluates it under the routing framework, and routes the session to the identified destination, including a queue or agent.

103. Zoom has directly infringed and continues to directly infringe through, for example, its own development, internal operation, use. quality assurance, testing, and demonstration of the ’911 Accused Products.

104. Zoom also directs and controls customers’ and end users’ use of the ’911 Accused Products.

105. Zoom has and continues to induce infringement under 35 U.S.C. § 271(b). Zoom has known of the ’911 patent at least since being contacted by PulseLink and no later than the filing date of the Complaint. Since at least that time, Zoom has been on notice of its infringement, and Zoom has actively induced infringement by others, such as Zoom’s distributors, customers, subsidiaries, importers, consumers, customers, and/or users, in this District and elsewhere in the United States. For example, Zoom’s customers and users directly infringe through their use of the ’911 Accused Products as shown in the exemplary claim chart. Zoom intends to cause, and has taken affirmative steps to induce infringement by its distributors, customers, subsidiaries, importers, consumers, customers, and/or users by at least creating or continuing to run advertisements that promote the infringing use of the ’911 Accused Products, creating and maintaining established distribution channels for the ’911 Accused Products into and within the United States, distributing or making available the ’911 Accused Products and instructions or manuals for the ’911 Accused Products to customers and users, testing the ’911 Accused Products, and/or providing technical support or services for the ’911 Accused Product

to customers and users in the United States. Zoom, for example, advertises and provides technical support to its customers and users of the ’911 Accused Products at zoom.us, zoom.com, and support.zoom.com. Zoom’s website provided, and continues to provide, instructions for using the ’911 Accused Products in a manner that results in infringement of the ’911 patent. Zoom induces infringement, for example, by distributing the products and publishing instructions, SDK materials, Flow documentation, skills-based-routing examples, and support materials that cause customers and end users to configure and use the accused routing sequence. As a result of Zoom’s inducement, Zoom’s customers and users use the ’911 Accused Products in the way Zoom intends and directly infringe the ’911 patent. Zoom does so knowing and intending that its customers and users will commit these infringing acts. Zoom also continues to make, use, offer for sale, import, and sell the ’911 Accused Products, despite its knowledge of the ’911 patent, thereby specifically intending for and inducing customers and users to infringe the ’911 patent through their normal and customary use of the ’911 Accused Products. Zoom also knew or was willfully blind that its actions would induce infringement by others and intended that its actions would induce infringement by others. Accordingly, a reasonable inference is that Zoom specifically intended for others to directly infringe one or more claims of the ’911 patent in the United States because Zoom had knowledge of the ’911 patent and actively induced others (e.g., its distributors, customers, subsidiaries, importers, consumers, customers, and/or users) to directly infringe the ’911 patent.

106. As alleged above, Zoom had prior knowledge of the ’911 patent and knew, should have known, or was willfully blind to the fact of Zoom’s infringement of the ’911 patent since that time, and has contributorily infringed and continues to contributorily infringe under 35 U.S.C. § 271(c) by contributing to the infringement of others, including, for example, Zoom’s

customers and end users, in this District and elsewhere in the United States by making, using, offering for sale, importing, selling, and providing the ’911 Accused Products, including the Flow Designer and related functionality, which constitute material parts of the claimed inventions, are especially made or adapted for infringing use, and are not staple articles suitable for substantial non-infringing use. For example, the portion of the ’911 Accused Products with the Flow Designer and related functionality is a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process. The portion of the ’911 Accused Products with the Flow Designer and related functionality is a material part of the claimed inventions and is not a staple article or commodity of commerce suitable for substantial non-infringing use. Further, Zoom knows that the portion of the ’911 Accused Products with the Flow Designer and related functionality is especially made or especially adapted for use in infringement of the ’911 patent.

107. Zoom has infringed literally and/or under the doctrine of equivalents, and PulseLink has suffered and continues to suffer substantial damages in an amount to be proven at trial.

**COUNT II - INFRINGEMENT OF THE ’324 PATENT**

108. PulseLink re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

109. PulseLink has not licensed or otherwise authorized Zoom to practice the inventions claimed in the ’324 patent.

110. Zoom has infringed and continues to directly and indirectly infringe at least claims 1 and 4 of the ’324 patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(a), (b), and (c), including by making, using, selling, offering for sale, and/or

providing in the United States the ’324 Accused Products. The ’324 Accused Products include the Zoom Workplace Desktop App and related Media Engine functionality. As shown in the exemplary claim chart attached as Exhibit E, these products infringe the asserted claims.

111. For example, claim 1 recites a method comprising receiving a plurality of unbulked and uncompressed data elements for transmission to a destination node; grouping first and second pluralities into first and second blocks; setting at least the first block’s size using a predetermined characteristic, with the first and second block sizes different; compressing the blocks into corresponding compressed blocks; locating the first compressed block in a transmission queue; determining connection status; sending the first compressed block in response to an acceptable status; and, in response to an unacceptable status, changing the number of data elements in the first block or increasing its degree of compression. These limitations define a media-processing and queue-control pipeline, not merely a desired result of compressing and transmitting data.

112. The ’324 Accused Products meet each limitation of at least claim 1, as set forth in the exemplary claim chart provided at Exhibit E and summarized below. The Zoom Workplace Desktop App running on a supported computer captures local video and transmits it through Zoom’s media path to a Zoom media server or remote participant endpoint.

113. As to the receiving and grouping limitations, the Media Engine receives uncompressed pixel or picture samples before encoding and groups successive capture intervals into first and second source-frame blocks. The samples in those blocks are separate pluralities of uncompressed data elements, and the frame blocks are formed before H.264/AVC compression. The Media Engine therefore performs the claimed data organization at the input side of the real-time transmission pipeline.

114. As to the predetermined-characteristic and different-size limitations, Zoom identifies resolution as a selectable characteristic and adjusts streams spatially by resolution. Resolution determines the number of picture locations in a source-frame block, so a 720p block of approximately 921,600 locations differs in size from a 360p block of approximately 230,400 locations. This also infringes claim 4, which specifies the number of data elements in the block as the predetermined characteristic and thereby requires a particular pre-compression control variable, not generic compression or an abstract instruction to change quality.

115. As to the compression and queue limitations, the Media Engine applies H.264/AVC to each source-frame block and produces a corresponding coded picture, access unit, or stream segment. On information and belief, it retains the encoded output in an ordered transmit buffer or equivalent scheduling queue before releasing it into the outbound stream. The ordered processing and queue placement connect the block-size and compression decisions to the timing and resource constraints of real-time media transmission.

> **The H.264 Scalable Video Codec adapts to video layouts, resolutions, and the video resolutions of other meeting participants**
>
> As more participants join a Zoom meeting, their Zoom applications will request certain video resolutions from the Zoom app that you are using. These requested resolutions will vary in quality based on the *remote* meeting participant's selected video layouts. Your Zoom application can transmit up to four H.264 AVC video streams simultaneously to accommodate different resolutions requested by participants on the far end. The H.264 AVC also adapts to your video settings for content sharing and layout.

116. As to the connection-status and acceptable-condition limitations, Zoom monitors network-quality statistics, callbacks, and diagnostics, including codec, frame-rate, and network information. When the status is acceptable for the selected stream, the Media Engine sends the queued compressed block; Zoom's materials identify estimated bandwidth conditions under

which selected-resolution streams are supportable. The accused operation thus couples a measured or determined connection condition to release of the queued compressed block.

117. As to the unacceptable-condition limitation, when the Reactive QoS Layer or Adaptive Codec detects a network or device condition that cannot support the selected configuration, Zoom can lower resolution, reduce frame rate, reduce bitrate, or otherwise adapt the stream. On information and belief, lowering resolution changes the number of uncompressed data elements in the source-frame block before re-encoding, satisfying the claimed alternative of changing block membership; increasing compression supplies the other claimed adaptive path. These operations change the data entering or produced by the compression pipeline in response to connection status rather than merely selecting a different display preference.

> **Example**
>
> If the Zoom Workplace desktop app is sending 720P resolution at 30 frames per second and the Reactive QOS layer detects that the CPU is highly utilized, the app will attempt to keep the same resolution but adjust to 15 frames per second to reduce the load on the CPU. If the Reactive QOS layer detects that the network I/O of the device itself is a bottleneck the Adaptive Codec will drop the resolution of all send/receive video streams to work within the available bandwidth. Taking these actions helps preserve audio for intelligible communication at low bandwidth.

118. Zoom has directly and continues to directly infringe through, for example, its development, internal operation, use, quality assurance, testing, and demonstration of the ’324 Accused Products.

119. Zoom also directs and controls customers’ and end users’ use of the ’324 Accused Products.

120. Zoom has and continues to induce infringement under 35 U.S.C. § 271(b). Zoom has known of the ’324 patent at least since being contacted by PulseLink and no later than the filing date of the Complaint. Since at least that time, Zoom has been on notice of its infringement, and Zoom has actively induced infringement by others, such as Zoom’s

distributors, customers, subsidiaries, importers, consumers, customers, and/or users, in this District and elsewhere in the United States. For example, Zoom's customers and users directly infringe through their use of the '324 Accused Products as shown in the exemplary claim chart. Zoom intends to cause, and has taken affirmative steps to induce infringement by its customers and users by at least creating or continuing to run advertisements that promote the infringing use of the '324 Accused Products, creating and maintaining established distribution channels for the '324 Accused Products into and within the United States, distributing or making available the '324 Accused Products and instructions or manuals for the '324 Accused Products to customers and users, testing the '324 Accused Products, and/or providing technical support or services for the '324 Accused Product to customers and users in the United States. Zoom, for example, advertises and provides technical support to its customers and users of the '324 Accused Products at zoom.us, zoom.com, and support.zoom.com. Zoom's website provided, and continues to provide, instructions for using the '324 Accused Products in a manner that results in infringement of the '324 patent. Zoom induces infringement, for example, by distributing the software and publishing quality, reliability, codec, and network materials that encourage the claimed adaptive operation. As a result of Zoom's inducement, Zoom's customers and users use the '324 Accused Products in the way Zoom intends and directly infringe the '324 patent. Zoom does so knowing and intending that its customers and users will commit these infringing acts. Zoom also continues to make, use, offer for sale, import and sell the '324Accused Products, despite its knowledge of the '324 patent, thereby specifically intending for and inducing customers and users to infringe the '324 patent through their normal and customary use of the '324 Accused Products. Zoom also knew or was willfully blind that its actions would induce infringement by others and intended that its actions would induce infringement by others.

Accordingly, a reasonable inference is that Zoom specifically intended for others to directly infringe one or more claims of the ’324 patent in the United States because Zoom had knowledge of the ’324 patent and actively induced others (e.g. its distributors, customers, subsidiaries, importers, consumers, customers, and/or users) to directly infringe the ’324 patent.

121. As alleged above, Zoom had prior knowledge of the ’324 patent and knew, should have known, or was willfully blind to the fact of Zoom’s infringement of the ’324 patent since that time.

122. Zoom has contributorily infringed and continues to contributorily infringe under 35 U.S.C. § 271(c) by contributing to the infringement of others, including, for example, Zoom’s customers and end users, in this District and elsewhere in the United States by making, using, offering for sale, importing, selling, and providing the ’324 Accused Products, including the Media Engine, which constitute material parts of the claimed inventions, are especially made or adapted for infringing use, and are not staple articles suitable for substantial non-infringing use. For example, the portion of the ’324 Accused Products with the Media Engine is a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process. The portion of ’324 Accused Products with Media Engine is a material part of the claimed inventions and is not a staple article or commodity of commerce suitable for substantial non-infringing use. Further, Zoom knows that the portion of the ’911 Accused Products with Media Engine is especially made or especially adapted for use in infringement of the ’911 patent.

123. PulseLink has suffered and continues to suffer substantial damages in an amount to be proven at trial.

**COUNT III - INFRINGEMENT OF THE ’340 PATENT**

124. PulseLink re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

125. PulseLink has not licensed or otherwise authorized Zoom to practice the inventions claimed in the ’340 patent.

126. Zoom has infringed and continues to directly and indirectly infringe at least claim 1 of the ’340 patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(a), (b), and (c), including by making, using, selling, offering for sale, and/or providing in the United States the ’340 Accused Products. The ’340 Accused Products include Zoom Cloud, Zoom Meetings, the Zoom Web App, Conference Room Connector, CRC Interop Service, Enhanced API Connector, CRC APIs, and related services. As shown in the exemplary claim chart attached as Exhibit F, these products infringe claim 1.

127. For example, claim 1 recites a method comprising providing, by a collaboration environment, a protocol-agnostic communications interface between a browser and one or more applications; operating that environment in a native mode or traditional mode as specified in the claim; conducting a communication session with the browser using a web-based communications protocol; and accessing the applications during the session through a feature invoker using a protocol-agnostic call/media API without exposing the applications to the web-based communications protocol. The claim therefore specifies the components, communications paths, invocation mechanism, and protocol separation that make the cross-protocol session possible.

128. The ’340 Accused Products meet each limitation of at least claim 1, as set forth in the exemplary claim chart provided at Exhibit F and summarized below. Zoom Cloud hosts Zoom Meetings and provides the Web App, Conference Room Connector, and related

interoperability services through which browser endpoints and endpoints using SIP or H.323 participate in the same session. The accused architecture supplies the claimed collaboration environment and coordinates web and native applications across distinct protocol paths.

129. As to the interface limitation, Zoom Cloud and CRC provide a communications and control layer between the browser-facing Zoom service and applications or devices using SIP, H.323, connector APIs, registration, calendar, call-control, device-management, and media functions. The web, SIP, and H.323 paths operate across protocols, and the common interface and call/media API coordinate those paths to provide the claimed protocol-agnostic interface. This is a concrete interoperability layer connecting otherwise heterogeneous communications systems.

# Joining a Zoom meeting

English (Original) 2026-06-26 Copy Permalink

There are multiple ways to join a Zoom meeting. You can join a meeting through an email or calendar invite, an instant messaging invite, from a web browser, from the Zoom Workplace desktop and mobile application, from a landline or mobile phone, Zoom Room, or with a SIP/H.323 device.

You can also join a test meeting to familiarize yourself with using Zoom, or join a meeting without an account.

130. As to the operating-mode limitation, the traditional-mode branch is practiced because managed SIP/H.323 room-system applications remain external to Zoom Cloud and operate natively through SIP or H.323 rather than through the browser's web-based protocol. In the alternative, Zoom-hosted Meetings and collaboration functions are contained within the collaboration environment and practice the native-mode branch. The claim's modes are disjunctive, and either branch independently satisfies the limitation while retaining the claimed interface and cross-protocol coordination.

### Join through other methods

You can also join a Zoom meeting through Zoom Chat, Auto-call, dialing in from a phone, SIP/H.323 device, or a Zoom Room.

‹ Zoom Chat | Auto-call | Telephone | SIP/H.323 | Zoom Room ›

1. Dial the IP address provided to you in the meeting invitation (requires Room Connector port add-on).
2. Enter the meeting ID by touch (DTMF) tones followed by #.
   You can also use dial strings, such as 192.168.10.55##000111000 to dial directly into the meeting.

131. As to the browser-session limitation, the Zoom Web App permits a user to join a meeting through a browser, and Zoom's browser-side implementation uses WebRTC and related web standards. The same Zoom Meeting can include standards-based SIP/H.323 room systems connected through CRC. The collaboration environment thus coordinates a web-based browser session with native signaling and media paths in one communication session.

## Web Controls and Dialing Procedures

This section describes the Conference Room Connector controls that are available in the Zoom web portal and multiple dialing options for supported H.323/SIP video conferencing devices to connect to the CRC gateway and join Zoom Meetings. Dialing options include manual dialing to the CRC gateway via SIP domains or IP addresses, advanced dial strings, pairing codes, and calling out to H.323/SIP devices from the Zoom desktop client or mobile application.

132. As to the feature-invoker limitation, the CRC, CRC Interop Service, Enhanced API Connector, or related browser-side control layer accesses or invokes the mapped applications during the session. The relevant functions include SIP/H.323 registration and signaling, meeting join and call-out, calendar integration, mute and unmute, device settings, management, status, and feedback, invoked through CRC and REST/API interfaces. These components provide the call/media invocation path that allows browser-side controls to operate native room-system functions through the protocol-agnostic interface.

133. As to the without-exposing limitation, Zoom's browser/WebRTC/HTTPS path remains separate from the SIP, H.323, and connector paths used by the room-system

applications. Browser controls can therefore invoke native room-system functions without exposing those applications to the browser's web-based communications protocol or requiring them to implement that protocol. The separation of protocol-specific paths at the interface and API boundary supports the claimed architecture, and Zoom has infringed literally and/or under the doctrine of equivalents.

# How to use the Zoom Web App while in a meeting

## View video

You can view participants' videos in Gallery view and Speaker view, as well as up to 9 specific participants videos, if the host spotlights someone. You can also stop all incoming video, which can be useful when you have limited internet bandwidth or to avoid mental fatigue.

## Invite others

1. Click **Participants** in the meeting controls.
2. In the lower-left corner of the **Participants** panel, click **Invite**.
3. The available options will depend on the available add-ons for your account, if you are the host, and if you are logged in.
   - **Contacts**: Invite Zoom contacts you already have established.
   - **Zoom Rooms**: Invite Zoom Rooms that are on your account.
   - **Email:** This will open up the options to send an email with your default email client, Gmail, Yahoo email, copy the URL, or copy the entire invitation.
   - **Call Out**: If you have an audio conferencing plan, you can call out to participants by phone. Enter the name you would like to display for them, select their country, enter their phone number, choose if you want them to hear a greeting or require them to press 1 before being connected, and click **Invite**.
   - **Room System**: If you have the Cloud Room Connector add-on, view the information for an H.323 or SIP room system to join the call or invite them by calling out to their IP address.

134. Zoom has directly infringed and continue to directly infringe through, for example, its own development, internal operation, use, quality assurance, testing, and demonstration of the '340 Accused Products.

135. Zoom also directs and controls customers' and end users' use of the '340 Accused Products.

136. Zoom has and continues to induce infringement under 35 U.S.C. § 271(b). Zoom has known of the '340 patent at least since being contacted by PulseLink and no later than the

filing date of the Complaint. Since at least that time, Zoom has been on notice of its infringement, and Zoom has actively induced infringement by others, such as Zoom's customers and users, in this District and elsewhere in the United States. For example, Zoom's customers and users directly infringe through their use of the '340 Accused Products as shown in the exemplary claim chart. Zoom intends to cause, and has taken affirmative steps to induce infringement by its distributors, customers, subsidiaries, importers, consumers, customers, and/or users by at least creating or continuing to run advertisements that promote the infringing use of the '340 Accused Products, creating and maintaining established distribution channels for the '340 Accused Products into and within the United States, distributing or making available the '340 Accused Products and instructions or manuals for the '340 Accused Products to customers and users, testing the '340 Accused Products, and/or providing technical support or services for the '340 Accused Products to customers and users in the United States. Zoom, for example, advertises and provides technical support to its customers and users of the '340 Accused Products at zoom.us, zoom.com, and support.zoom.com. Zoom's website provided, and continues to provide, instructions for using the '340 Accused Products in a manner that results in infringement of the '340 patent. Zoom induces infringement, for example, by providing the Web App, room-connector services, interoperability guides, dialing and control procedures, APIs, registration instructions, calendar integration, and device-management materials that cause customers and integrators to conduct the accused cross-protocol sessions. As a result of Zoom's inducement, Zoom's distributors, customers, subsidiaries, importers, consumers, customers, and/or users use the '340 Accused Products in the way Zoom intends and directly infringe the '340 patent. Zoom does so knowing and intending that its customers and users will commit these infringing acts. Zoom also continues to make, use, offer for sale, import and sell the '340

Accused Product, despite its knowledge of the ’340 patent, thereby specifically intending for and inducing customers and users to infringe the ’340 patent through their normal and customary use of the ’340 Accused Products. Zoom also knew or was willfully blind that its actions would induce infringement by others and intended that its actions would induce infringement by others. Accordingly, a reasonable inference is that Zoom specifically intended for others to directly infringe one or more claims of the ’340 patent in the United States because Zoom had knowledge of the ’340 patent and actively induced others (e.g., its distributors, customers, subsidiaries, importers, consumers, customers, and/or users) to directly infringe the ’340 patent.

137. As alleged above, Zoom had prior knowledge of the ’340 patent and knew, should have known, or was willfully blind to the fact of Zoom’s infringement of the ’340 patent since that time. Zoom has contributorily infringed and continues to contributorily infringe under 35 U.S.C. § 271(c) by contributing to the infringement of others, including, for example, Zoom’s customers and end users, in this District and elsewhere in the United States by making, using, offering for sale, importing, selling, and providing the ’340 Accused Products, including the CRC and interoperability functionality, which constitute a material part of the claimed invention, especially made or adapted for infringing use, and not a staple article suitable for substantial non-infringing use.

138. For example, the portion of the ’340 Accused Products with the CRC and interoperability functionality is a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process. The portion of ’340 Accused Products with the CRC and interoperability functionality is a material part of the claimed inventions and is not a staple article or commodity of commerce suitable for substantial non-infringing use. Further, Zoom knows that the portion of the ’340 Accused Products with the

CRC and interoperability functionality is especially made or especially adapted for us in infringement of the ’340 patent.

139. By reason of Zoom's infringement of the ’340 patent, PulseLink has suffered and continues to suffer substantial damages in an amount to be proven at trial.

## COMPLIANCE WITH 35 U.S.C. SECTION 287

140. PulseLink has not itself made, offered for sale, sold, or imported products practicing the Asserted Patents that would require marking under 35 U.S.C. § 287(a).

141. PulseLink seeks damages consistent with the notice and marking requirements of § 287. The marking requirement does not apply because PulseLink presently asserts method claims, including claims 11, 13, 14, 15, and 16 of the ’911 patent, claims 1 and 4 of the ’324 patent, and claim 1 of the ’340 patent.

142. PulseLink has complied with § 287 to the extent applicable and reserves the right to supplement these allegations as discovery and the investigation of predecessor products and marking practices proceed.

## PRAYER FOR RELIEF

WHEREFORE, PulseLink respectfully requests that the Court enter judgment in its favor and against Zoom as follows:

a. A judgment in favor of PulseLink that Zoom has infringed, directly and indirectly by inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, one or more claims of the ’911 patent;

b. A judgment in favor of PulseLink that Zoom has infringed, directly and indirectly by inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, one or more claims of the ’324 patent;

c. A judgment in favor of PulseLink that Zoom has infringed, directly and indirectly by inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, one or more claims of the ’340 patent;

d. An award of damages adequate to compensate PulseLink for Zoom’s infringement under 35 U.S.C. § 284, but in no event less than a reasonable royalty, together with supplemental damages for continuing infringement through judgment;

e. Order an accounting of all damages;

f. Enhanced damages, including treble damages, under 35 U.S.C. § 284 for infringement found to be willful;

g. Pre-judgment and post-judgment interest as allowed by law;

h. A declaration that this action is exceptional under 35 U.S.C. § 285 and an award of PulseLink’s reasonable attorneys’ fees, costs, and expenses; and

i. An ongoing royalty or other equitable relief for post-judgment infringement, declarations that the Asserted Patents are valid and enforceable, and such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, PulseLink demands a trial by jury on all issues so triable.

## **RESERVATION OF RIGHTS**

PulseLink’s investigation is ongoing, and material technical information remains in the possession of Zoom or third parties. PulseLink reserves the right to amend or supplement these

allegations, the identified claims, the accused products and functionality, and the requested relief in accordance with the Federal Rules of Civil Procedure and the rules and orders of this Court.

Dated: August 14, 2026

Respectfully submitted,

_/s/ Brian E. Farnan_______________

Brian E. Farnan (No. 4089)
Michael J. Farnan (No. 5165)
**FARNAN LLP**
919 North Market St., 12th Floor,
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiff PulseLink Systems, LLC*

OF COUNSEL:
**BOIES SCHILLER FLEXNER LLP**
Blair M. Jacobs
Christina A. Ondrick
John S. Holley
John Wittenzellner
1401 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 237-2727